GILBERT BRISSON *vs.* GLEN FALLS INSURANCE COMPANY.

SAME *vs.* THE FIRE ASSOCIATION OF PHILADELPHIA.

Androscoggin.    Opinion October 25, 1920.

*Action on two fire insurance policies.   Proof of loss.   Verdicts manifestly against the weight of evidence.*

Action upon two policies of fire insurance covering household goods and furniture issued April 26, 1918, each for the sum of $750. The fire occurred November 7, 1918. The jury returned a verdict for the plaintiff for the full amount claimed in each case.

Upon defendant's motion for new trial, it is,

*Held:*

1.   That the main issue was whether prior to the fire a substantial part of the insured goods, including a piano valued at $350., had been removed from the plaintiff's house in Turner and taken to a tenement in Auburn, and still were fraudulently included in the plaintiff's proof of loss.

2.   That this was a question of fact for the determination of the jury, but a careful study of all the evidence, in the light of the circumstances, leads to the conclusion that these cases call for the supervisory power of the court, the verdicts rendered being manifestly against the weight of the evidence.

These two actions of assumpsit on policies of fire insurance covering household goods and furniture, each for the sum of $750, were tried together. Plea, the general issue, in each case, with a brief statement, alleging that before the fire certain articles of the property covered by the policies in suit were removed from the premises where they were when the policies were issued, and where they were to remain

under the terms of the policies, without the assent of defendants in writing.    Verdict for plaintiff for $778.12 in each case.    Defendants file a general motion to have the verdicts set aside.    Motion sustained.

Case stated in the opinion.

*George C. Wing, and George C. Wing, Jr.,* for plaintiff.

*William H. Newell,* for defendants.

SITTING:    CORNISH, C. J., SPEAR, HANSON, MORRILL, WILSON, JJ.

CORNISH, C. J.    Actions upon two fire insurance policies on household goods and furniture, dated April 26, 1918, and each for the sum of $750.    The fire occurred November 7, 1918, and the house in which the goods were situated, together with its contents, was totally destroyed.

That the fire was set by or with the connivance of the plaintiff is not directly charged, although its origin is unexplained and the defendants regard the situation as suspicious.    That the goods and furniture represented a value equal to or in excess of the amount of the insurance at the time the policies were issued is not contested. The insurance agent before issuing the policies examined the property and testified that it was a well furnished house and that he satisfied himself that that was the proper amount of insurance to issue.

Nor do the defendants claim fraudulent over valuation in the plaintiff's proofs of loss.    Two or three days after the fire, the plaintiff who cannot read, and is able to write only his name, sat down with his wife and daughter and together they made out a list of the articles claimed to have been lost, assigning a value to each.    This list was given to the defendants.    Subsequently at defendants' request another proof of loss was furnished.

The value of two of the articles named in both lists was admitted by the plaintiff to have been wrong; a leather set of three pieces which should have been one hundred dollars for the whole instead of one hundred dollars each or three hundred dollars, and a sofa which should have been forty dollars instead of one hundred dollars.    With the exception of these two items which the plaintiff claims, and we think properly, to have been erroneously and not fraudulently over-valued, none of the valuations as stated in the proofs of loss was attacked by the defendants.

This left a single issue of fact to be decided by the jury, and by that issue the plaintiff's case was to stand or fall. That issue was whether prior to the fire the insured goods, or a substantial part of them, including a piano valued at $350 had been removed from this house in the town of Turner and taken to a tenement in the City of Auburn by one Lebarge, a brother-in-law and employe of the plaintiff on the Turner place, and therefore went around the fire instead of through it.

That Lebarge did haul several loads, three or four or five, with a team made up of the plaintiff's horse and a neighbor's farm wagon, is testified to by various neighbors. The exact time when the removal took place is not definitely fixed, but in a general way is left as having occurred in the Summer or Fall of 1918.

The plaintiff admits that Lebarge, who was his brother-in-law, but did not testify, hauled several loads of furniture and furnishings to the Auburn tenement, but replies to the charge of fraud by stating that those goods formed no part of the property insured and situated in the house, but belonged to one Montreuil, his son-in-law. In this he is corroborated by Montreuil and his wife, the daughter of the plaintiff. Their story is that they were married in September, 1917, and were living together in Worcester, Mass. until the Summer of 1918, he during that time or just previously being employed as a bar tender and she as a waitress in a Chinese restaurant. They did not keep house but were living at a rooming house, so called, and neither had nor had need of any household furniture. In June, 1918, Montreuil says he saw an advertisement in a Worcester paper for the sale of household furniture, and with his wife visited the place and bought it of a woman who was a stranger to him and whose name he does not remember. He purchased complete furniture and furnishings for two bed rooms, kitchen, parlor and dining room, together with rugs, carpets, stove, mattresses, etc. At this trial he stated that he paid her $350 cash for the entire lot; at a former trial of Brisson he testified that he paid $500 for the lot. He took no bill of sale of the property, nor a receipt for the money paid. Then he says he brought these goods by auto truck from Worcester to the plaintiff's place at Turner, about the first of July, 1918, and stored them in the plaintiff's stable loft. He paid the driver of the truck sixty dollars for transportation but took no receipt and does not know the driver's name. Montreuil says he came on the truck with the goods and remained in Turner until early September, working a part of the time

on the farm and a part in the shoe shop, and then he went to Auburn. Mrs. Montreuil came from Worcester to Maine by train at the same time, and lived at the Turner place with her father and mother up to the time of the fire.

· Early in October Mrs. Montreuil hired a tenement in Auburn, and to that tenement the Montreuils say their goods were taken from the stable loft during the month of October. After the fire they went to this Auburn tenement and the plaintiff and his wife with them to make their home.

The plaintiff's story as to the upright piano which after the fire was found in the Auburn tenement uninjured was this, as stated by himself and his daughter, Mrs. Montreuil. The daughter in 1914, three years before her marriage, bought an upright piano make unknown, from her sister, and it was taken to the parlor of the Turner house. Then in 1916, the plaintiff bought another upright piano of one Goodnowsky for $350 and that was placed in the parlor and the daughter's removed to the dining room. Then at Christmas, 1917, they exchanged pianos and what had been the daughter's became now the father's and was placed in the parlor, and the Goodnowsky piano now belonging to the daughter, was placed in the dining room. So that there were two pianos in the house from 1916 to October 11, 1918, a few days before the fire, when the Goodnowsky instrument was removed to Auburn, leaving the other to be burned. That is the explanation offered for the existence of the Goodnowsky piano after the fire.

The defendants rely, and with reason, upon the inherent improbability of the testimony of the plaintiff and his family as above related, an improbability which increases the more the case is studied.

"Mere words are not necessarily proof and Courts are not compelled to allow justice to be preverted because incredible evidence is not contradicted by direct and positive testimony." *Rovinsky* v. *Assurance Co.*, 100 Maine, 112. Here however the incredible evidence corroborated by no one outside the plaintiff's family is contradicted by direct and positive testimony from neighbors and others, all apparently disinterested and trustworthy, who had occasion to be there; one negativing the storage of any goods in the stable loft, no less than eight who had been at the house on various occasions knowing of only one piano, and it is quite unlikely that an article of furniture as bulky as a piano would have escaped the attention of

all these people, especially as two pianos in one small house are rather unusual; others who looked in the windows soon after the fire started, when the occupants were absent and the house was locked, and saw no furniture of any amount; and still others who examined the contents of the cellar three weeks after the fire and found the only metallic substances to be the parts of a stove, one part of an iron bedstead, a part of two springs, a wash boiler, some tin kettles and pieces of stove funnel. Yet the proof of loss contains many articles which could not wholly burn, such as a piano, a sewing machine, three iron bedsteads, three bed springs, a grafanola and various smaller articles. No remnant of these was found. True this search was made three weeks after the fire, but there is no evidence that anything had been removed or disturbed and we see no reason why it should have been.

A careful study of all the evidence, in the light of the circumstances, leads us irresistibly to the conclusion that these cases call for the supervisory power of the court, the verdicts rendered being manifestly against the weight of the evidence.

Motion sustained.